1. FALSE PRETENSES — OWNERSHIP OF PROPERTY — MORTGAGES — DEEDS—CONTRACTS—EFFECT—INSTRUCTIONS.

In a prosecution for false pretenses, the evidence showed that respondent, being indebted to his father, conveyed to him a half interest in certain real estate as security. Thereafter, at the request of certain other creditors, the father and son conveyed the property to the wife of one of the creditors, taking a contract in the name of the son which provided for payment of the indebtedness and that he should remain in possession of the premises. *Held*, that the title to the property was in the respondent, and that an instruction submitting the question of ownership, and the falsity of his representations as to his ownership of the property to the jury as an open one was reversible error.

2. SALES—REMEDY OF VENDOR—STOPPAGE IN TRANSITU.

Though the delivery of goods by a vendor to a common carrier is, in law, a delivery to the vendee, the vendor retains the right of stoppage in transitu.

3. FALSE PRETENSES—EVIDENCE—ADMISSIBILITY.

In a prosecution for false pretenses inducing a sale of goods on credit, it appeared that respondent referred the complaining witness to a bank, where he had filed a financial statement. The complaining witness, after he had delivered the goods to a carrier for transportation to respondent, and before delivery by the carrier to him, made inquiry of the bank and was informed that respondent had filed a statement showing he was worth a large sum specified above his liabilities and exemptions. *Held*, that the statement, together with evidence that it was false, was admissible as bearing upon respondent's intent in making the representations.

4. SAME.

If the jury found, in accordance with his testimony, that, except for said statement on file in the bank, the complaining witness would have stopped the actual delivery to respondent, they would have been authorized to find that the shipment was made in reliance upon that statement.

5. SAME—HARMLESS ERROR.
   Where, in a prosecution for false pretenses, respondent admitted his insolvency at the time the representations complained of were made, the error, if any, in admitting in evidence a circular, subsequently made by respondent's attorney in involuntary bankruptcy proceedings, showing a statement of respondent's financial condition, was not prejudicial.

6. WITNESSES — COMPETENCY — PRIVILEGED COMMUNICATIONS—ATTORNEY AND CLIENT.
   Statements made by respondent at a conference between respondent, his attorney, and others were not confidential, and hence not privileged, and the attorney may testify thereto.

Exceptions before judgment from Eaton; Smith, J. Submitted June 12, 1908. (Docket No. 117.) Decided July 1, 1908.

William Andre was convicted of obtaining money by false pretenses. Reversed.

*Frank A. Dean,* for appellant.

*Elmer N. Peters,* Prosecuting Attorney, for the people.

BLAIR, J. Exceptions before sentence to review conviction of obtaining money by false pretenses. Defendant Andre was engaged in the business of buying and selling eggs, poultry, etc., at Grand Ledge, under the title of the Grand Ledge Cold Storage Company. The complaining witness, George J. Scoefield, of Eaton Rapids, having seen Mr. Andre's advertisement for the purchase of eggs, went to Grand Ledge on the 28th of April, 1906, and proposed to sell eggs to Andre. In the course of this interview, it is alleged, the false representations relied upon were made. The information sets out the false pretenses and the furnishing of the eggs in reliance thereon, as follows:

"That he, said William Andre, was the owner of the Grand Ledge Cold Storage plant, located at Grand Ledge, Michigan, and that he, the said William Andre, desired

to purchase eggs for the purpose of storage, which said eggs were to be stored in the east by said William Andre; that he desired to secure as many eggs as possible, and was, therefore, willing to spring the price in order to secure early eggs for said purpose of storage; that the storage at Grand Ledge was to be used by him, the said William Andre, later for the purpose of storing butter; that he, the said William Andre, on the date aforesaid, also gave to said George J. Scoefield the name of the Grand Ledge State Bank as a party to whom he could refer to make inquiry as to said William Andre's financial condition and responsibility; that thereafter, and on, to wit, the seventh day of May, A. D. 1906, the said George J. Scoefield inquired of the said Grand Ledge State Bank as to the financial standing and responsibility and honesty of the said William Andre, and was then and there informed by the cashier of said Grand Ledge State Bank that it, the Grand Ledge State Bank, had on file a statement made by the said William Andre, which showed that the said William Andre was worth the sum of eighteen thousand dollars over and above all debts, liabilities and exemptions; and believing the false pretenses and representations so made as aforesaid by the said William Andre, he, the said George J. Scoefield, was then and there deceived thereby, and was then and there induced by means of said false pretenses and representations so made as aforesaid to deliver, and did thereafter and on, to wit, the 11th day of May, A. D. 1906, deliver to said William Andre 18 cases of eggs of the value of $111, and did on the 12th day of May, A. D. 1906, deliver to said William Andre 150 cases of eggs of the value of $700, all of the value of $811 of the property of him the said George J. Scoefield; that the said William Andre did then and there, designedly and by means of said false pretenses and representations made as aforesaid, unlawfully and fraudulently obtain from the said George J. Scoefield the said 168 cases of eggs, of the goods and property of the said George J. Scoefield with intent then and there to cheat and defraud him, the said George J. Scoefield, of the same; whereas in truth and in fact the said William Andre was not, on said 28th day of April, A. D. 1906, the owner of the said Grand Ledge Cold Storage plant, and did not desire to purchase eggs for the purpose of storage, and said eggs were not to be stored in the east by said William Andre, and the said William Andre was not springing the price in order to secure early eggs for

the purpose of storage, and the said William Andre was not worth the sum of $18,000 over and above all debts, liabilities and exemptions, all of which pretenses and representations so made by the same William Andre as aforesaid, were false in fact, and were, at the time and place aforesaid, well known by the said William Andre to be false and fraudulent."

On the 12th day of May, 1906, Mr. Scoefield shipped to Andre from Eaton Rapids 150 cases of eggs at a value of between eight or nine hundred dollars, for which he received checks on the 16th or 17th of May, which were protested for nonpayment. On the 14th of May, Mr. Scoefield, having become suspicious, called up the Michigan Tradesman at Grand Rapids, who informed him:

"They were not thoroughly convinced about his being all right and that he had no authority to use them as reference. I then called up the cashier of the Grand Ledge State Bank thinking that he would know more about it than anybody else, he being near by. He told me that Andre had a statement on file which he had every reason to believe was true to the effect that he, Andre, was worth $18,000 over and above everything and that his reputation for honesty and so forth was good. My intention was if I received an unfavorable report to stop the eggs en route or to have them replevied if he had them in his possession. I never received my pay for those eggs shipped on those two days. I was deceived by those representations that Mr. Andre had made to me as to his ownership of the property and purpose in buying them and paying that price as I have testified; and I was deceived by the report made to me by the cashier of the Grand Ledge State Bank."

The car of 150 crates of eggs shipped by Scoefield to Andre was consigned to the Grand Ledge Cold Storage Company, which, according to Andre's testimony, was composed of himself, and arrived at Grand Ledge on May 15 at ten o'clock p. m.

The court, after reading the information to the jury, instructed them that they could not consider the statement of the respondent filed with the bank and the representations made by the bank to the complainant Scoefield as

causes which induced Scoefield to deliver his eggs to the respondent:

"For the reason that it is undisputed that the eggs were delivered to respondent before complainant Scoefield had any knowledge of the said statement in the bank; in other words, such bank statement cannot be considered as false representations on the part of the respondent by which Scoefield was induced to part with his property. You should, however, gentlemen, consider that proof with the other proof in the case on the question of his intent, that is, you should consider it with all the other proof in the case to determine whether the statements made by respondent as to his ownership of the cold storage plant at Grand Ledge and his desire to purchase eggs for the purpose of storage in the east and statements connected therewith, should you find from the proof he made such statements as to the ownership and the other statements connected therewith, you should consider them to determine whether they were designedly false and made to induce Scoefield to part with his property and were successful."

The only false representations submitted to the jury, as appears from the charge of the court and as stated by the prosecuting attorney, were: (1) that Andre was the owner of the cold storage plant; (2) that he was springing the price of eggs for the purpose of securing early eggs to be stored in the east and that he was storing them in the east.

Numerous assignments of error are presented, several of which are abandoned by counsel for respondent, and we shall only consider those which we deem important for the purpose of disposing of the case.

1. It is argued that the representation by respondent that he owned the property on the 28th day of April, 1906, was not false, and that the court erred in submitting that question to the jury as an open question. It appears from the record that in February, 1906, the title to the real estate in question stood in the name of respondent Andre and his father, Herman Andre. Respondent testified, and his testimony was the only testimony upon the subject in the record, that, prior to the deed to Mrs. Berry hereinafter referred to, he deeded to his father,

Herman Andre, a half interest because "he said I ought to be protected, and I said, ' I will deed you a half interest in this property,' which was some time in January, 1905, 'to secure you for what I owe you.' He said, all right, and I deeded him a half interest in the property."

Mr. Briggs, one of the three owners of the Loan & Deposit Bank of Grand Ledge, a private bank, testified:

"Mr. Andre has been a borrower at my bank and did business with us 8 or 10 years, stopping on the 1st of February, 1906. At that time he was indebted to Mr. Berry, the president of the bank, to the amount of about $9,600 which was secured by a real estate mortgage and also a trust deed to Mrs. Berry, wife of the president of the bank, subject to mortgage. Deed from William Andre and wife and Herman Andre and wife to Jennie M. Berry, introduced, marked Exhibit A and read in evidence, the description of the property in said deed being the same as the description of the property contained in Exhibit B. At the same time the deed was executed a contract was executed to Mr. Andre which is marked Exhibit B and reads as follows."

The contract was in most respects the usual form of land contract, in which respondent agreed positively to pay—

"Nine thousand six hundred twelve and ninety-six one hundredths ($9,612.96) dollars, in the manner following, to wit: On or before October 1st, 1906, with lawful interest from the date hereof, at the rate of six per cent., payable every thirty days upon so much of the purchase money as remains unpaid."

It also contained the following clause:

"It is mutually agreed by and between the parties hereto that in case of the payment of the said sum of nine thousand six hundred twelve and ninety-six one hundredths dollars, or any part thereof, by the said second party, that first party will promptly apply any and all payments on said second party's indebtedness to the banking firm of Berry, Briggs & Berry, and it is also understood that said second party has the right to make payments of any amount on this contract."

Mr. Briggs further testified:

"The purpose of having this contract and deed executed was to get possession of the property and save the time and expense of a foreclosure of the mortgages."

This contract was executed on the 16th day of February, 1906. It further appears from Mr. Briggs' testimony that the bank held a chattel mortgage as additional security.

Mr. Alexander, attorney for the Loan & Deposit Bank, testified:

"I commenced proceedings before a circuit court commissioner to oust him from the property after the expiration of the contract and you, Mr. Zimmer, appeared as attorney for Mr. Andre and raised the objection that the circuit court commissioner had no jurisdiction and that proceedings must be had by foreclosure. I took judgment by default and proceeded to oust Mr. Andre but have since commenced proceedings by foreclosure, in chancery, to get possession of the property. The title to the property was not in Mr. Andre on the 28th of April last. It was in Jennie M. Berry. It did not pass to her absolutely, but passed to her subject to the condition of the contract October 1, 1906."

We are of the opinion that the respondent's assignment of error is well founded and the court should have instructed the jury, as a matter of law, upon this record, that the title and ownership of this property was in the respondent. The case falls directly within the case of *Clark* v. *Landon,* 90 Mich. 83, and is even stronger, because in the case at bar the contract provided that respondent was to remain in possession of the premises. See, also, *Flynn* v. *Holmes,* 145 Mich. 606.

The case is entirely dissimilar from *Reed* v. *Bond,* 96 Mich. 134; *Blumberg* v. *Beekman,* 121 Mich. 647, and like cases. In the case at bar, the indebtedness was kept on foot and was not discharged nor intended to be discharged by the contract.

The fact that the title originally stood of record as in respondent and his father, Herman, is of no consequence, if his interest was conveyed to him as a security, as testi-

fied to by respondent, and under the facts of this case ceases to be of consequence for the reason that Herman agreed to the transaction and conveyed the property to Mrs. Berry, the wife of the president of the bank, with reference to the contract placing the entire title in the name of respondent.

2. Defendant's counsel contend with reference to the introduction of the financial statement filed by respondent with the bank:

"Its introduction in evidence was flagrant error and laid the foundation for the subsequent testimony of Kilbourne, Briggs, Alexander, and the circular letter of T. Rogers Lyons, attorney for Andre in bankruptcy hereafter to be noted. It had no relevancy to the issue, but raised a false issue to prejudice the jury and allowed the prosecution to introduce testimony of the financial status of the bankrupt's estate months after the offense was committed."

We do not think the judge erred in his instruction to the jury that this financial statement could be considered by them in determining respondent's intent in making the alleged representations to Scoefield nor in permitting testimony to show that the financial statement was false. Moreover, we are of the opinion that the prosecution were entitled to go to the jury upon the question whether Scoefield relied upon this financial statement and was induced thereby to make the shipments of eggs in question. The mere fact that the information alleged dates earlier than the delivery to the common carrier as the dates upon which Scoefield relied upon the false representations in making shipments is not controlling. While a delivery to the railway company was, in law, a delivery to the respondent, still, the vendor retained the right of stoppage in transitu, and if the jury found, as the agent of the Pere Marquette railroad testified, that "that car arrived at 10 p. m. May 15," Scoefield could have stopped its delivery at any time, at least prior to that hour. And if the jury found, in accordance with his testimony, that, except for the state-

ment from the bank of the financial standing of respondent as shown by his statement on file obtained in the meantime, Scoefield would have stopped the actual delivery to respondent, then we think they would have been authorized to find that the shipment really was in reliance upon that statement.

3. That the court erred in admitting in evidence a circular letter issued to the creditors of William Andre, against whom involuntary bankruptcy proceedings had been instituted, by his attorney, Mr. T. Rogers Lyons, for the purpose of informing them that a composition had been offered and furnishing a statement of the affairs and condition of the bankrupt estate. This circular was offered with the following statement by the prosecuting attorney :

" I claim this circular states—showing an indebtedness of $50,000 and assets of $18,000, 25 per cent. of the fifty would be $12,500. It shows they are seeking even now to get a compromise of the creditors by means of the representations they made in this and there would be a difference between $12,500 and $18,000.

*"The Court:* I think that may be admitted."

Although it appears that respondent knew of the contents of this circular and distributed several of them, we do not think the circular prepared and signed by the attorney for the purpose of obtaining a composition sometime after the making of the alleged false representations was admissible for the purpose alleged, although it is not apparent how the introduction of the circular could have prejudiced the respondent, who admitted an indebtedness largely in excess of his assets existing at the time the representations were made.

4. That the court erred in permitting the testimony of Mr. Kilbourne to be given, who, at the time to which his testimony related, was acting as attorney for Mr. Andre. The testimony related to a conference at the office of Mr. Alexander between Mr. Andre and his attorney, Mr. Kilbourne, on the one side, and Mr. Alexander and Mr. Briggs, upon the other. The statements made at this

conference were evidently not confidential in any respect and were, consequently, not privileged. *Cady* v. *Walker*, 62 Mich. 157; 23 Am. & Eng. Enc. Law (2d Ed.), 73. We are also of the opinion that the testimony was admissible as against the grounds of incompetency, immateriality, and irrelevancy.

For the error in submitting the question of ownership of real estate to the jury, the conviction is reversed, and a new trial granted.

GRANT, C. J., and MOORE, CARPENTER, and McALVAY, JJ., concurred.